# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-CV-22797-SMITH/LOUIS

SEABOARD MARINE LTD, INC.,

    Plaintiff,

v.

TRINPAK PACKAGING CO. LTD., and
BODIN OIL RECOVERY, INC.

    Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant Bodin Oil Recovery, Inc.'s Motion for Summary Judgment, filed on June 18, 2019 (ECF No. 93) ("Motion"). Plaintiff Seaboard Marine Ltd., Inc. filed a Response in Opposition on July 2, 2019 (ECF No. 96) ("Response"), and Bodin Oil Recovery, Inc. filed a Reply on July 10, 2019 (ECF No. 99) ("Reply"). The Court has carefully reviewed the Motion, all supporting and opposing submissions, and the record as a whole. For the reasons set forth below, the Motion (ECF No. 93) is **GRANTED**.

## I.   BACKGROUND

This matter arises from a *pro forma* marine bill of lading bearing booking number 3748683A (ECF No. 1-2) ("Bill of Lading" or "Bill"), which was issued for the overseas transport of two containers of used motor oil. The Bill of Lading lists the names of three corporations: Seaboard Marine Ltd., Inc., Trinpak Packaging Co. Ltd., and Bodin Oil Recovery, Inc (*id.*). Seaboard Marine Ltd., Inc., is the Florida trade name for Seaboard Marine Ltd., a foreign corporation engaged in the business of transporting goods internationally by water (ECF No. 105

1

at 2 ¶ 1). Trinpak Packaging Co. Ltd. is a foreign corporation engaged in the business of selling and exporting petrochemical products including used motor oil (*id.* at ¶ 4). Bodin Oil Recovery, Inc. is a Louisiana corporation engaged in the business of used oil recycling (*id.* at ¶ 5). The Bill identifies Seaboard Marine Ltd., Inc. (hereinafter "Seaboard") as the carrier, Trinpak Packaging Co. Ltd. ("Trinpak") as the shipper, and Bodin Oil Recovery, Inc. ("Bodin Oil") as the consignee (ECF No. 1-2). The Bill is unsigned by any party (*id.*). The Terms and Conditions to the Bill of Lading require that consignees and shippers, both classified as "Merchants" under the Bill, must be held jointly and severally liable to the carrier for the payment of all charges and for the performance of all obligations under the Bill (*id.* at 2). The Bill requires that "Merchants" must "pack[] [cargo] in a manner adequate to withstand the ordinary risks of Carriage," and that they shall be held liable for "all loss or damage of any kind whatsoever, including but not limited to, contamination, soiling, detention and demurrage before, during and after the Carriage of property" (*id.* at 5).

On June 25, 2014, Trinpak sent Bodin Oil a proposal via email for the sale of used oil by Trinpak to Bodin Oil, memorializing a prior phone call (ECF No. 62-7 at 6). Bodin Oil did not respond to this proposal. On July 7, 2014, Trinpak booked transportation with Seaboard Trinidad, Ltd. ("Seaboard Trinidad"), a Trinidadian corporation and Seaboard's agent, in order to ship oil overseas (ECF No. 93-3 at 6-7). Trinpak alone arranged for all of the shipping of the cargo (ECF No. 107-1 at 24:14). The booking slip provided to Seaboard Trinidad by Trinpak does not identify Bodin Oil, as consignee or otherwise (*id.*). Trinpak sent an invoice for $20,224.00 to Bodin Oil on July 9, 2014, addressing its June 25, 2014 sale proposal (ECF No. 62-7 at 7). Bodin Oil did not respond to or pay the amount listed on Trinpak's invoice (ECF No. 105 at 3 ¶ 9). To date, Bodin Oil has never purchased used oil from Trinpak (*id.* at ¶ 10).

On July 18, 2014, Seaboard issued the Bill of Lading based on information it obtained from Seaboard Trinidad (ECF No. 1-2; ECF No. 105 at 3 ¶ 12). The Bill identifies for shipment two containers of used motor oil, including container number SMLU 2604408 which was loaded with one Flexibag (a large reinforced bag designed to carry liquids in bulk) containing 6,400 gallons of used motor oil ("the Container") (ECF No. 1-2). Prior to creation of the Bill, Seaboard had no communication with any representative from Bodin Oil, nor did it possess any documentation stating that Bodin Oil was the owner or importer of the cargo (ECF No. 93-1 ¶ 2).

The Container was loaded aboard the *M/V Sandwig* at the Port of Point Lisa, Trinidad, which departed on July 18, 2014 for Kingston, Jamaica, with a final destination of Louisiana (ECF No. 105 at 3 ¶ 18). During the voyage, the ship's crew noticed what it identified as oil in the hold of the vessel where the Container was held prior to the ship's arrival in Kingston (*id*. at ¶ 19). Upon arrival in the transshipment port in Kingston, the container leaking motor oil was discharged from the vessel, and the leaked motor oil was cleaned up. Bodin Oil never purchased any of the oil from Trinpak that was on the vessel (ECF No. 93-3 at 16).

Seaboard Freight and Shipping Jamaica, Ltd. ("Seaboard Jamaica"), another agent of Seaboard's, engaged the services of Morgan Marine and P & I Services ("Morgan Marine") to investigate the source of the oil in the hold of the ship, who issued a "Final Damage Report for the Incident Onboard the MV Sandwig" (ECF No. 93-3 at 15-25) ("Damage Report" or "Report"). The Damage Report certified that, upon completion of inspection of the drained Flexibag and Container at issue, the Morgan Marine appointed surveyor and accompanying team were "not able to pin point the exact source of the spillage with a high level of accuracy" (*id*. at 16). The Damage Report first notes that its preliminary investigation revealed that there were several containers in the bay with oil-based products (*id*. at 17). The Report further explains that after the vessel arrived

in Kingston on July 21, 2014, Morgan Marine conducted its preliminary survey (*id*. at 18). Morgan Marine determined that based on the color and aroma of the leaked oil, it was assumed that the leak came from one of the two containers listed on the Bill of Lading, which were a part of eight containers total in the lower holds of the vessel (*id*. at 19). The Report states that a joint inspection with Seaboard's representative was conducted the next day, which led Morgan Marine to confirm that there was oil under the relevant Container; nonetheless, it notes that there were no punctures or holes in any of the container panels, indicating that a foreign item may have penetrated one of the panels (*id*. at 22). An inspection of the Container and Flexibag occurred the following day, which led Morgan Marine to report that "[t]here was no sign or cause for the leakage of the bag" and "the joint team could not locate any area on the Flexibag from which the oil escaped" (*id*. at 23-24). Specifically, the Report states that "[t]he Flexibag was removed from the container and inspected, still no sign of the source of leakage observed. The surveyor and the other members of the joint team could not locate any area on the Flexibag from which the oil escaped. A further inspection was made of the container, floor panel but the area remained clean and without any sign of damage" (*id*. at 24). The Report concludes the following:

> It was the view of the surveyor that these Flexitanks were not for the transportation of Petroleum products however there was no information located on the Manufacturer's webstate [*sic*] to support these claims.
>
> (. . .)
>
> The surveyor could not assess the information as to whether certified personnel stack and stowed the Flexitank used in the operation. It has been noted that a number of the damages which occurred with these bags are due to human errors.
>
> After a thorough inspection of the Flexitank the surveyor did not identify the source of the leak.
>
> The surveyor however is bias to believe the source may have been the bag's valve.

4

> It is the recommendation of the surveyor to have the Flexitank be inflated to identify the leak, if any.

(*id*. at 25). No follow-up report, if it exists, has been made a part of the record.

On February 10, 2015, Seaboard Jamaica's Chief Accountant, Michael Tyrek, sent a letter to Mr. Chehade M. Boulos of Trinpak, seeking $156,842.65 for cleanup and other fees related to the oil spill (ECF No. 93-3 at 9-10). The letter does not indicate that it was sent to anyone at Bodin Oil. The record does not show that Trinpak ever paid Seaboard (or Seaboard Jamaica) any portion of the sought fees, or otherwise responded to this letter.

Over three years later, on June 12, 2018, Seaboard's Vice President and General Counsel, Stephen C. Irick, Jr., sent a letter to Trinpak and Bodin Oil, demanding immediate payment of a slightly less amount of $156,219.62 for the oil leak (ECF No. 93-3 at 11-13). Again, there is no record evidence of any payment or response to this letter by either Trinpak or Bodin Oil.

One month later, Seaboard filed the underlying suit in this Court against both Trinpak and Bodin Oil on July 12, 2018, alleging claims of contractual indemnity and breach of contract against each Defendant (ECF No. 1). Specifically, Seaboard alleges that Defendants failed to properly describe the cargo, failed to comply with applicable laws, regulations, and requirements as mandated by the authorities, and did not adequately pack the cargo. Trinpak failed to answer the Complaint and a Clerk's Default was entered against it (ECF No. 25). Pursuant to the Court's Order on Default Judgment Procedure (ECF No. 26), Seaboard filed a Notice of Joint Liability (ECF No. 31), submitting that Trinpak and Bodin Oil are jointly and severally liable and that Bodin Oil's liability must be resolved before Seaboard can move for an entry of default final judgment against Trinpak. Accordingly, Bodin Oil is the only remaining Defendant. Bodin Oil filed the present Motion for Summary Judgment on June 18, 2019 (ECF No. 93), which is ripe for adjudication.

5

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of

6

the nonmovant's case to prevail on summary judgment. *See Celotex*, 477 U.S. at 323; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

## III. DISCUSSION

Bodin Oil seeks summary judgment in its favor on all claims against it, arguing that (1) Seaboard lacks standing to sue where Seaboard Jamaica paid the expenses associated with the cleanup of the vessel; (2) there was no contract between Trinpak and Bodin Oil; (3) there was no agency relationship between Trinpak and Bodin Oil that would bind Bodin Oil to the contract; (4) even if there were a contract, there is no evidence of a breach by Bodin Oil; and (5) the doctrine of laches estops Seaboard from recovering against Bodin Oil. Because the Court finds that summary judgment is properly entered for Bodin Oil based on the failure of Seaboard to establish a prima facie case for any of its claims against Bodin Oil, the Court need not address Bodin Oil's first and fifth arguments as to standing and laches respectively.

7

As a threshold issue, the Court has jurisdiction over this bill of lading dispute and federal maritime law applies to the parties' dispute. A bill of lading is the basic transportation contract between the shipper-consignor and the carrier. *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982). Each term of the bill of lading "has in effect the force of a statute, of which all affected must take notice." *Id.* at 343. A bill of lading that requires a substantial carriage of goods by sea for the purpose of effectuating maritime commerce is a maritime contract. *Altadis USA, Inc. ex rel. Fireman's Fund Ins. Co. v. Sea Star Line, LLC*, 458 F.3d 1288, 1294 (11th Cir. 2006) (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 27 (2004)). Federal courts have primary jurisdiction over maritime contracts. *Misener Marine Const., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 837 (11th Cir. 2010). Additionally, venue is proper here pursuant to the forum selection clause of the Bill of Lading at issue here, which states that "[a]ll disputes in any way relating to this Bill of Lading shall be determined by the United States District Court for the Southern District of Florida, in Miami, Florida," provided that the carrier does not submit to the jurisdiction of another court (ECF No. 1-2 at 12).

Here, the bill of lading is a maritime contract because its main purpose was to transport goods by sea from a port in a foreign country to one in the United States, *i.e.*, effectuating maritime commerce. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004); *Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 277 (2d Cir. 2000) (bill of lading for ocean carriage is a maritime contract). Maritime contracts are "construed like any other contracts by their terms and consistent with the intent of the parties" by common law principles of contract interpretation. *Norfolk*, 543 U.S. at 31; *Nippon Yusen Kaisha v. FIL Lines USA, Inc.*, 977 F. Supp. 2d 343, 349 (S.D.N.Y. 2013). Thus, the elements of a breach of a maritime contract, like any other contract, are: (1) the existence of a valid contract; (2) a material breach; and (3) damages. *Cibran Enterprises, Inc. v. BP Prod. N. Am., Inc.*,

8

365 F. Supp. 2d 1241, 1254 (S.D. Fla. 2005). Further, to prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).

Bodin Oil contends that it is not a party to the Bill of Lading and thus is not liable under the terms thereof because it never agreed to be listed as a consignee, never accepted Trinpak's offer to purchase goods, and otherwise had no involvement with the creation of the Bill of Lading or any other aspect of the shipping with Seaboard.

The Eleventh Circuit has examined this issue in the context of a freight bill of lading as to whether a named consignee who otherwise did not consent to being named was a party to a bill of lading contract:

> [A] consignee is the party designated to receive a shipment of goods. But, consignee status is more than a mere designation. The term takes on a legal significance due to the quasi-contractual relationship that arises between the consignee and the carrier. Although a consignee's liability may rest upon quasi-contract, a party's status as consignee is a matter of contract and must be established as such. Like any contractual relationship, there must be a meeting of the minds between the parties. This Circuit has previously recognized that it is a fundamental principle of contracts that in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract.

*Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1281 (11th Cir. 2009) (internal citations and quotation marks omitted).

It is undisputed that the Bill of Lading identifies Bodin Oil as a "consignee" and by its terms, holds consignees, as "Merchants," jointly and severally liable for any breaches of the Bill. However, the record is devoid of evidence that Bodin Oil, whose signature appears nowhere on the Bill, consented to be designated as a consignee to the Bill of Lading. Seaboard's corporate representative testified that Trinpak alone arranged for all of the shipping of the cargo (ECF No. 107-1 at 24:14). As stipulated by Seaboard, Bodin Oil never purchased used oil from Trinpak in this transaction or any other. Seaboard has also conceded that it had no communication with any

9

representative from Bodin Oil prior to creation of the Bill, nor does it possess any documentation stating that Bodin Oil was the owner or importer of the cargo at issue. Based on the record evidence, the Court cannot find that Bodin Oil was a party to the contract. *See Norfolk S. Ry. Co.*, 586 F.3d at 1282 (affirming district court's grant of summary judgment where named consignee was not a party to bill of lading contract where it did not agree to be named as consignee and was not aware of its designation as such).

Nonetheless, there is some precedent for binding a named consignee to the bill of lading, even without the consignee's signature, where it is shown that the consignee accepted the bill of lading by filing a lawsuit under the bill of lading (referred to as "acceptance theory") or that an agency relationship exists between the consignee and one of the parties to the bill of lading ("agency theory"). *Taisheng Int'l Ltd. v. Eagle Mar. Servs., Inc.*, No. CIV.A. H-05-1920, 2006 WL 846380, at *3 (S.D. Tex. Mar. 30, 2006); *see also Vimar Seguros y Reaseguros v. M/V SKY REEFER*, 515 U.S. 528 (1995); *All Pac. Trading, Inc. v. M/V HANJIN YOSU*, 7 F.3d 1427 (9th Cir. 1993); *Nippon*, 977 F.Supp.2d 343; *In re Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2009). The Court finds that the "acceptance theory" does not apply to the facts of this case, where Bodin Oil has not filed suit under the Bill, but instead is only defending itself and denying any connection to the contract. The "agency theory," however, bears examination, as Seaboard contends that Trinpak was acting as Bodin Oil's agent in entering into the Bill of Lading and arranging for shipping with Seaboard. At least one district court has held that an agency relationship exists where a consignee purchases merchandise from a seller and authorizes the seller to ship the goods, making the seller the agent to the consignee-principal. *Taisheng*, 2006 WL 846380, at *4.

Upon examination, the Court does not accept Seaboard's "agency theory" that Trinpak was acting as Bodin Oil's agent when it entered into the contract. Seaboard has not submitted any evidence that an agency relationship existed between Trinpak and Bodin Oil. In an attempt to prove its agency theory, Seaboard points to Bodin Oil's acknowledgment of receipt of Trinpak's email addressing the terms of the sale of the cargo to Bodin Oil and the invoice that Trinpak sent Bodin Oil, as well as the testimony of Charles Keith Bodin, president of Bodin Oil, from his deposition and from the Court's evidentiary hearing on February 1, 2019. Though Trinpak sent a sale proposal and an invoice to Bodin Oil, there is no evidence that Bodin Oil responded to Trinpak's proposal or paid the amount listed on Trinpak's invoice. Regarding Mr. Bodin's testimony, Seaboard cites to the following lines of questioning in support of its argument:

> Q. Sorry. Regarding the e-mail, did you ever call him or speak with him and tell him not to ship any product?
> A. No.
> Q. Okay. Did you understand that he was gonna present product to you in the United States for sale, used oil, or use it to purchase if it passed inspection?
> A. Yeah.
> Q. Okay and so this e-mail, Exhibit #2, corresponds to his communication regarding used oil that Trinpak is gonna present to Bodin Oil for purchase if it passes inspection. Correct?
> A. Correct.

(ECF No. 62-3 at 23:11-25).

> Q. He sent you this proposal, he sent you the invoice. If that cargo had shown up on your doorstep and passed your specifications and your price, you would have brought it, right?
> A. I would have bought it, yeah.
> Q. All right. And you would have turned around and sold it and made money on it, right?
> A. That's right.
>
> (. . .)
>
> Q. Avani wasn't involved in the subject transaction with Trinpak?
> A. No, sir.
> Q. You were dealing directly with Trinpak, right?

11

> A. Trinpak called me.
> Q. And money -- if you were to purchase this, the money would go to Trinpak, right?
> A. That money would go to Trinpak, yeah.

(ECF No. 96-1 at 25:20-26:2; 28:3-10). Mr. Bodin's testimony, however, only evidences the possibility that he would have purchased the oil had it arrived at his yard and subsequently passed inspection. An agency relationship can only exist where the consignee actually purchases merchandise from a seller and authorizes the seller to ship the goods. *Taisheng*, 2006 WL 846380, at *4. Mr. Bodin did not testify, nor does the record evidence show, that any purchase was made or authorization given by Bodin Oil for Trinpak to ship goods to Seaboard. Under these circumstances, the Court cannot find that an agency relationship existed between Trinpak and Bodin Oil.

Seaboard avers that the case *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343 (S.D.N.Y. 2013) espouses "analogous circumstances" to the instant case. There, the court found that the consignee was liable to the carrier for unpaid freight charges arising from the transport of cargo from ports in India to the port of Los Angeles. The carrier had issued bills of lading to the shipper at origin on which the defendant's name was inserted in the spaces identified as "Consignee" and "Notify Party." Upon arrival at destination, the *Nippon* court determined that the designated consignee did not take actual delivery of any of the materials shipped, and, as a result, demurrage and detention charges accrued. However, the crucial distinction between *Nippon* and this case is that the defendant there did not dispute its liability under the terms of the bill of lading, but asserted that it was acting as an agent for other principals, an argument that the court rejected. Here, Bodin Oil does not admit liability under the Bill, nor does it contend that it was acting as an agent for Trinpak or any other principal. Quite the opposite: the point of dispute here

is whether Trinpak was acting as Bodin Oil's agent. The Court therefore does not find *Nippon* persuasive authority in support of Seaboard's argument.

Seaboard also argues that the evidence shows that Bodin Oil has been a consignee for numerous shipments of used motor oil transported under bills of lading issued by ocean carriers, including Seaboard, and has also been importer of record for more than 30 shipments. The parties have stipulated that from June 1, 2014 to May 30, 2015, Bodin Oil had a continuous entry customs import bond, which it had acquired in connection with a specific bulk purchase of oil from Venezuela (ECF No. 105 at 4 ¶ 21). However, these facts have no connection to the Bill of Lading at issue here; Bodin Oil's status as a consignee in other transactions are not relevant to show that it was a consignee to the transaction at hand.[1] Thus, the Court finds this evidence irrelevant to the present case.[2]

Even assuming *arguendo* that Bodin Oil could be bound by the terms of the Bill of Lading, Seaboard has also failed to submit evidence sufficient to meet its burden of proof at trial that Bodin Oil was a cause of the oil spill. Seaboard's evidence of Bodin Oil's breach begins and ends with the Morgan Marine Damage Report, which concluded that it could not identify the exact source of the leak. Putting aside the speculative nature of the Damage Report, Seaboard has presented no other evidence, testimonial or documentary, as to the cause of the oil leak. Seaboard has admitted that it has no evidence that the volume of oil recovered from the Flexibag in the Container was determined and recorded either in gallons or weight (ECF No. 93-1 at ¶ 20). While Seaboard maintains that the Damage Report speaks for itself, it has designated no witness having personal

---

[1] Even so, Seaboard has admitted that it has no documentary evidence of the identity of the person designated as the importer of the ship's cargo, nor any U.S. Customs related documents required for the cargo to be discharged into the United States (ECF No. 93-1 ¶ 6).
[2] So too does the Court find irrelevant Bodin Oil's proffered evidence of similar transactions that it was involved in (ECF No. 93-2 at 7-10).

knowledge, has designated no expert witness, and has produced no documents reflecting the procedures used for the collection of the sample or samples, the chain of custody of the sample or samples, or the results of the analysis (ECF No. 93-1 at ¶ 21). Seaboard does not even have the manifest of the entire cargo from the voyage[3] (*id.* at ¶ 9). Though the Court does not analyze whether Bodin Oil's laches defense applies here, it does observe that the four-year lapse in time between the oil spill and the filing of this lawsuit has clearly resulted in minimal evidence from which to develop the record. Although Seaboard insists that it has "[w]itnesses who will testify at trial" on these issues (ECF No. 96 at 3), this is insufficient at the summary judgment stage, where the nonmoving party must show by affidavits, depositions, answers to interrogatories, and admissions that the Court should not grant summary judgment against it. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Because Seaboard has failed to meet its burden in the face of Bodin Oil pointing out the lack of evidence for Seaboard to prove its case; summary judgment in Bodin Oil's favor is granted.

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant Bodin Oil Recovery, Inc.'s Motion for Summary Judgment (ECF No. 93) is **GRANTED**.

2. All claims against Defendant Bodin Oil Recovery, Inc. are **DISMISSED WITH PREJUDICE**.

3. The scheduled bench trial is **CANCELLED**.

---

[3] Nor does it have the contact information of the captain or any of the crew members of the vessel (ECF No. 93-1 at ¶ 8).

4. The Court will enter a separate judgment.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 26th day of September, 2019.

RODNEY SMITH
UNITED STATES DISTRICT JUDGE